AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| The person of Anthony Butterfield, as described more fully in Attachment A. | ) ) ) ) |

2:22-MJ-2120
Case No.

FILED
CLERK, U.S. DISTRICT COURT

**May 27, 2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____IM_____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A*

located in the Central District of California, there is now concealed:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm/Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ James Chung
_____
*Applicant's signature*

James Chung, ATF Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 27, 2022

*Patricia Donahue*
_____
*Judge's signature*

City and state: Los Angeles, CA

Honorable Patricia Donahue, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Elia Herrera – (213) 894-2024

## **ATTACHMENT A**

PERSON TO BE SEARCHED

The person of Anthony BUTTERFIELD ("BUTTERFIELD"), date of birth 2/8/1986, with California Driver's License Number D7735396.  BUTTERFIELD's California Department of Motor Vehicles records lists him as standing 5'10" tall, with brown hair and brown eyes.

The search of BUTTERFIELD shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, folders, and bags that are within BUTTERFIELD's immediate vicinity and control at the location where the search is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 United States Code Sections 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances); Title 18 United States Code Sections 922(g) (prohibited person in possession of a firearm), 924(c) (possession of a firearm in furtherance of a drug trafficking crime), 931(o) (Possession of Body Armor by Violent Felon), 924(o) (Possession of a Silencer); and Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearm) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

f.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

g.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

h.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

j.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

k.    Contents of any calendar or date book;

l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

m.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

n.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

     i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     iii. evidence of the attachment of other devices;

     iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     v. evidence of the times the device was used;

     vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

     vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

     viii. records of or information about Internet Protocol addresses used by the device;

     ix. records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital devices on-site or
seize and transport the devices and/or forensic images thereof
to an appropriate law enforcement laboratory or similar facility
to be searched at that location.  The search team shall complete
the search as soon as is practicable but not to exceed 120 days
from the date of execution of the warrant.  The government will
not search the digital devices and/or forensic images thereof
beyond this 120-day period without obtaining an extension of
time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

ii.   The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated
techniques.

      c.   If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device
pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

      d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

      f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

      g.   The government may also retain a digital device
if the government, prior to the end of the search period,

obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

     f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

     g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Anthony BUTTERFIELD's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of Anthony BUTTERFIELD's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law

enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, James Chung, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Anthony BUTTERFIELD ("BUTTERFIELD") for a violation of Title 18, United States Code, Section 922(g)(1): Felon in Possession of a Firearm/Ammunition.

2.    This affidavit is also made in support of an application for a warrant to search the person of BUTTERFIELD, as described more fully in Attachment A, for evidence, fruits, or instrumentalities of violations of Title 21 United States Code, Sections 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances); Title 18, United States Code, Sections 922(g) (prohibited person in possession of firearms and ammunition), 924(c) (possession of a firearm in furtherance of a drug trafficking crime), 931(o) (Possession of Body Armor by Violent Felon), 924(o) (Possession of a Silencer); and Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearm) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates are approximate.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since July 2020. I am currently assigned to the Glendale I Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF Special Agent includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchase operations, including the use of informants.

5.    As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 26 weeks.  This training included instructions on federal and state firearms and narcotics laws and regulations.

6.    I have experience in investigations involving violations of federal statues governing firearms, explosives, and narcotics.  I have also participated in investigating violations of state firearms and narcotics laws.  I have assisted in the execution of state and federal search warrants.

I have also conducted surveillance of individuals committing crimes of violence, individuals trafficking firearms, individuals trafficking illegal narcotic substances, prohibited persons in possession of firearms, and persons possessing illegal firearms.  I have participated in the interviews of criminal defendants, informants, and witnesses.  Additionally, I have participated in the seizure of records and other types of evidence that documents activities in both firearms trafficking and the manufacturing and distribution of controlled substances.

7.    Prior to my employment with ATF, I was a Probation Officer with the New York City Department of Probation for two years.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On January 7, 2022, Los Angeles Police Department ("LAPD") Officers responded to a radio call regarding an ongoing assault with a deadly weapon at 3748 Inglewood Blvd., Los Angeles, CA.  The victim, who is BUTTERFIELD's neighbor, told officers that on the street in front of his residence, he and BUTTERFIELD engaged in a verbal dispute.  BUTTERFIELD was holding an axe in his hand, and BUTTERFIELD took a rifle out from a truck and said, "Hey, come over here and talk now".

9.    On January 20, 2022, LAPD Officers arrested BUTTERFIELD in front of 3758 Inglewood Blvd., Apt. 1, Los Angeles, California 90066 ("3758 Inglewood Blvd.") and executed a state search warrant at that location.[1]  Officers recovered four firearms, one suppressor, two body armor plates, suspected

---

[1] BUTTERFIELD was released on bail after the arrest.

narcotics, and a cache of assorted ammunition from inside 3758
Inglewood Blvd.

10.   BUTTERFIELD has sustained at least four prior
felonies, and is therefore prohibited from possessing firearms
and ammunition.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.   January 7, 2022: BUTTERFIELD Assaults J.S. and
Brandishes Firearm Outside of 3758 Inglewood Blvd.**

12.   According to LAPD reports, on January 7, 2022, LAPD
Officers Thomas and Bell responded to a radio call of an "ADW
[Assault with a Deadly Weapon] Suspect There Now" at 3748
Inglewood Blvd, Los Angeles, CA.   Officers spoke to the victim,
J.S., who stated he and BUTTERFIELD engaged in a verbal dispute
as BUTTERFIELD was pacing back and forth in front of the
residence with an axe in his hand.   The victim told officers
that BUTTERFIELD then produced a rifle from the vehicle, held
the rifle in his right hand and told the victim, "Hey come over
here and talk now."   The victim did not respond and entered the
victim's residence without further incident.

**B.   January 20, 2022: Officers Find Fentanyl, Guns, a
Suppressor, and Body Armor at 3758 Inglewood Blvd.**

13.   Based on a search of records from the California DMV,
I learned that BUTTERFIELD reported 3758 Inglewood Blvd. as his
residence.   BUTTERFIELD's application date with the DMV is
February 8, 2018.   In addition, BUTTERFIELD has been seen

operating a 2003 Chevrolet bearing CA license plate number R365L0 registered to his mother, J.M. at 3758 Inglewood Blvd.

14.   On January 20, 2022, at 1:50 p.m., the Honorable Robert C. Vanderet of the Superior Court, County of Los Angeles, Judicial District, signed a state search warrant for 3758 Inglewood Blvd.; any vehicles which in the custody or control of BUTTERFIELD; and BUTTERFIELD's person.

15.   On the same day, LAPD officers executed the search warrants at 3758 Inglewood Blvd.  Officers arrested BUTTERFIELD as he was walking out of 3758 Inglewood Blvd.  Inside 3758 Inglewood Blvd. was BUTTERFIELD's grandmother.

16.   Officers conducted a search at 3758 Inglewood Blvd. and found several envelopes addressed to "ANTHONY BUTTERFIELD 3758 Inglewood Blvd Apt 1, Los Angeles, CA 90066" inside the residence.

17.   Officers also recovered the following items inside the residence:

a.   Four firearms located throughout 3758 Inglewood Blvd.: one on the floor near the living room coffee table; one on top of BUTTERFIELD's bed, which was located in the living room and had envelopes addressed to BUTTERFIELD on and around the bed; one inside a hidden compartment of a mirror, that was located next to BUTTERFIELD'S bed; and one underneath the mattress in a separate bedroom;

b.   Three glass containers containing an off-white powdery substance resembling fentanyl (two containers had eight

zip lock bags with powder and one container had loose powder) inside a safe in the living room, next to BUTTERFIELD's bed;

       c.  A suppressor on top of BUTTERFIELD's bed, next to one of the firearms;

       d.  Two body armor plates inside a cabinet in the carport area; and

       e.  Various magazines, along with a cache of assorted ammunition located throughout 3758 Inglewood Blvd. and the two cabinets in the carport area.

18.  On May 11, 2022, I received a Chemical Analysis Report from the Drug Enforcement Administration for the off-white powdery substance recovered from 3758 Inglewood Blvd.  The results showed that the substances weighed 207 grams and contained p-Flouroentanyl and with a portion of the substance also containing fentanyl.

**C.    BUTTERFIELD Admitted Possessing Firearms, Ammunition, Fentanyl, and Body Armor**

19.  On January 20, 2022, in a recorded interview, Detective Jurado advised BUTTERFIELD of his <u>Miranda</u> rights and BUTTERFIELD agreed to participate in an interview.  BUTTERFIELD admitted that he possessed three of the firearms found at 3758 Inglewood Blvd., but said that one of the firearms, a 9mm handgun, belonged to his grandmother.  BUTTERFIELD admitted that the ammunition at 3758 Inglewood Blvd. belonged to him. BUTTERFIELD also admitted that the substance at 3758 Inglewood Blvd. was fentanyl, and belonged to him.  BUTTERFIELD said it was for personal use.  BUTTERFIELD admitted that the body armor

belonged to him, and said it is a tactical vest.  BUTTERFIELD said that the suppressor was not a suppressor but a fuel filter for his dirt bike.

### D.   BUTTERFIELD Has Been Convicted of Multiple Felonies

20.  On March 3, 2022, I reviewed certified conviction documents for BUTTERFIELD and learned that BUTTERFIELD has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

21.  On September 23, 2008, BUTTERFIELD was convicted of Assault with a Deadly Weapon, in violation of California Penal Code 245(a)(1), in the Superior Court of the State of California, County of Los Angeles, Case Number SA064693.

22.  On December 12, 2013, BUTTERFIELD was convicted of Possession For Sale a Controlled Substance, in violation of California Health and Safety code section 11351, in the Superior Court of the State of California, County of Los Angeles, Case Number SA082530.

23.  On December 12, 2013, BUTTERFIELD was convicted of Possession of Firearm by a Felon-Prior(s), in violation of California Penal Code 29800(A)(1), in the Superior Court of the State of California, County of Los Angeles, Case Number SA084484.

24.  On February 4, 2014, BUTTERFIELD was convicted of Assault with a Deadly Weapon, in violation of California Penal Code 245(a)(1), in the Superior Court of the State of California, County of Los Angeles, Case Number SA083571.

E.    **Interstate Nexus**

25.  On April 5, 2022, an ATF Interstate Nexus Expert examined the firearms and ammunition found at 3758 Inglewood Blvd. and determined the following:

a.    One firearm is a DPMS model A15, multi caliber AR-type receiver bearing serial number F132137K, manufactured by LAR Manufacturing in West Jordan, Utah for DPMS.  In order for this firearm to be recovered in California, it had to have moved in interstate commerce.

b.    One firearm is an Aero Precision model X15, multi caliber AR-type receiver bearing serial number X350058, manufactured by Aero Precision LLC in Tacoma, Washington.  In order for this firearm to be recovered in California, it had to have moved in interstate commerce.

c.    One firearm is a HS Product model XD9, 9mm caliber pistol bearing serial number BY289364, manufactured by HS Produkt in Croatia.  In order for this firearm to be recovered in California, it had to have moved in foreign commerce.

d.    Twenty-one rounds of .300 blackout caliber ammunition bearing headstamps "GFL" over "300 BLK" were manufactured by Fiocchi in Missouri, Italy, or Hungary.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

e.    One round of .223 Remington caliber ammunition bearing headstamp "223 REM" over "WOLF" was manufactured by Wolf Ammunition in Taiwan.  In order for this ammunition to be

8

recovered in California, it had to have moved in foreign commerce.

       f.    Sixty-three arounds of .300 blackout caliber ammunition bearing headstamp "GFL" over "300 BLK" were manufactured by Fiocchi in Missouri, Italy, or Hungary.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

       g.    One hundred and one rounds of .223 Remington caliber ammunition bearing headstamp "223 REM" over "WOLF" were manufactured by Wolf Ammunition in Taiwan.  In order for this ammunition to be recovered in California, it had to have moved in foreign commerce.

       h.    Fifty rounds of .223 Remington caliber ammunition bearing headstamp "G.F.L" over "223 REM." were manufactured by Fiocchi in Missouri, Italy, or Hungary.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

       i.    Four hundred and two rounds of .300 blackout caliber ammunition bearing headstamp "GFL" over "300 BLK" were manufactured by Fiocchi in Missouri, Italy, or Hungary.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

       j.    Two hundred fifty-three rounds of 9mm Luger caliber ammunition bearing headstamps "G.F.L." over "9mm LUGER" were manufactured by Fiocchi in Missouri, Italy, or Hungary.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

k.    One hundred sixteen rounds of 9mm Luger caliber ammunition bearing headstamps "PMC" over "9MM LUGER" were manufactured by Poonsan Metals Corp. in Nevada, Mexico, or South Korea.  In order for this ammunition to be recovered in California, it had to have moved in interstate or foreign commerce.

**V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>**

26.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms sometimes sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

e.    Persons who are prohibited from possessing firearms, such as felons, must go to greater lengths to obtain firearms because they are not permitted to purchase them legally, and as a result tend to retain possession of those firearms.  It appears that BUTTERFIELD has retained at least three firearms in particular: (1) as described above, a DPMS Inc. model A15, multi caliber AR type pistol bearing serial number F132137K; (2) an Aero Precision model X15, multi caliber

11

AR type pistol bearing serial number X350058; and (3) an HS
Product model XD9, 9mm caliber pistol bearing serial number
BY289364.  He has also gone through other sophisticated efforts
to obtain firearms, including gaining access to privately made
firearms (commonly known as ghost guns), or guns without a
serial number.

### VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

27.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.    Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-

12

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence

13

or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

16

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

31.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Anthony BUTTERFIELD's thumb- and/or fingers on the devices; and (2) hold the devices in front of Anthony BUTTERFIELD's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.   CONCLUSION

33.   For all of the reasons described above, there is probable cause to believe that Anthony BUTTERFIELD has committed a violation of Title 18 United States Code Section 922(g)(1): Felon in Possession of a Firearm.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person of Anthony BUTTERFIELD described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this   27th   day of
   May      , 2022.

*Patricia Donahue*
_____
THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE